IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL ACTION NO. 21-91-1 |
| | : | |
| GABRIEL RIVERA-OTERO | : | |

## MEMORANDUM

**Padova, J.**                                                                              **March 29, 2023**

Defendant Gabriel Rivera-Otero has filed a Motion to Suppress, seeking to suppress evidence seized during searches conducted at two properties he is associated with following his arrest on drug trafficking charges. Defendant claims that these searches violated the Fourth Amendment because the law enforcement officers who arrested him searched the properties without first obtaining either a warrant or his actual and voluntary consent. We held a Hearing on the Motion on January 25, 2023. For the reasons that follow, we deny the Motion.

## I.       BACKGROUND

### A.       The Indictment

Defendant has been charged with two counts of knowingly and intentionally possessing with intent to distribute 400 grams or more of a mixture and substance containing a detectable amount of fentanyl, a Schedule II controlled substance, on October 28, 2020, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A), and 18 U.S.C. § 2. Count One of Indictment 21-91 charges Defendant Rivera-Otero and his Co-Defendant Angel Reyes-Valdez with knowingly and intentionally possessing approximately 6,015.2 grams of fentanyl with intent to distribute; Count Two charges Defendant Rivera-Otero with knowingly and intentionally possessing approximately 729.5 grams of fentanyl with intent to distribute. Both Counts One and Two also charge that Defendant had a previous final conviction for a serious drug felony before he committed the

offenses charged in those Counts, namely an April 18, 2012 conviction in the United States District Court for the District of Delaware for conspiracy to possess 100 grams or more of heroin with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B) and 846, for which he served more than 12 months of imprisonment.  Count Four of the Indictment charges Defendant with managing and controlling a residence located at 3502 North Philip Street in Philadelphia on October 28, 2020, that was used "for the purpose of unlawfully manufacturing, storing and distributing a controlled substance, that is, heroin, a Schedule I controlled substance, and [fentanyl], a Schedule II controlled substance" in violation of 21 U.S.C. § 856(a)(2).

      B.    <u>Findings of Fact</u>

We find the following facts based on the testimony and evidence introduced in connection with our January 25, 2023 hearing.[1]  Defendant, whose real name is Carlos Vasquez,[2] is 38 years old and was born in and grew up in Puerto Rico.  (1/25/23 Hr'g Tr. at 73-74.)  He attended public school in Puerto Rico through the fifth grade.  (<u>Id.</u>)  He grew up speaking Spanish with his family and was taught in Spanish in school.  (<u>Id.</u> at 74-75.)  He moved to Philadelphia in 2004, when he was 20 years old.  (<u>Id.</u> at 75.)  He lives in North Philadelphia and, since he moved to Philadelphia, he has worked in grocery stores and as a mechanic.  (<u>Id.</u>)  He speaks Spanish both at work and outside of work.  (<u>Id.</u> at 75-76.)  Defendant took English as a second language classes for one hour per day for two years when he was in prison.  (<u>Id.</u> at 76-77.)  Defendant testified at the Hearing

---

[1]  In finding these facts, we credit the testimony from the Government's witnesses at the January 25, 2023 Hearing and we largely find Defendant's testimony to be not credible.

[2]  Defendant testified at the Hearing that his real name is Carlos Vasquez, but he used to use the name Gabriel Rivera-Otero.  (1/25/23 Hr'g Tr. at 73.)  At the time of his arrest in this case, he told the law enforcement officers who arrested him that his name is Carlos Vasquez.  (<u>Id.</u> at 73-74.)

that, despite these English classes, he does not feel comfortable conversing in English and requires an interpreter for Court proceedings.[3]  (Id. at 77.)

Defendant has two prior drug trafficking convictions.  In 2009, he pled guilty in the Court of Common Pleas of Philadelphia County to possession of narcotics with intent to distribute.  (Id. at 92.)  In 2012, he pled guilty to narcotics trafficking charges in the United States District Court for the District of Delaware.  (Id.)  In October 2020, Defendant was on supervised release as a result of the second conviction.  (Id. at 92-93.)

As of October 2020, Defendant had been under investigation by a Drug Enforcement Administration Task Force for approximately two months for fentanyl trafficking.  (Id. at 7-9.)  The Task Force conducted physical surveillance of Defendant and identified the house located at 3502 North Philip Street in Philadelphia as a location where he spent the overnight hours.  (Id. at 8-9.)

On October 28, 2020, the Task Force arrested Defendant in the shared parking lot of the Walmart and Home Depot stores on Roosevelt Boulevard in Philadelphia.  (Id. at 16-18.)  Defendant was inside of a Mercury Mountaineer.  (Id. at 17.)  He was taken into custody at 1:03 p.m. for attempting to sell six kilograms of fentanyl to an informant.  (Id. at 17-18.)  The six kilograms of fentanyl were on the passenger seat of the Mercury Mountaineer, inside a Pampers diaper box.  (Id. at 18.)  There were at least five unmarked police vehicles and one fully marked Philadelphia police car in the Walmart/Home Depot parking lot at the time of Defendant's arrest.  (Id.)  The Task Force Officers who effected Defendant's arrest wore tactical vests with police markings.  (Id. at 19.)  Defendant was removed from the Mercury Mountaineer and handcuffed by

---

[3] Defendant was provided with an interpreter during our January 25, 2023 Hearing on the Motion to Suppress.

Task Force Officer ("TFO") Walter Bartle.  (Id. at 4, 19.)  He was then placed in the marked police car with two uniformed police officers.  (Id. at 19.)  Defendant's Co-Defendant in this case, Angel Reyes-Valdez, was arrested at the same time and placed in the same police car.  (Id. at 20.)   The police cars, including the marked police car holding Defendant and Mr. Reyes-Valdez, subsequently left the Walmart/Home Depot parking lot and drove across Roosevelt Boulevard to a parking lot belonging to Friends Hospital.  (Id. at 20-21.)  Task Force Officers also drove Defendant's Mercury Mountaineer and Mr. Reyes-Valdez's Ford Escape to the Friends Hospital parking lot.  (Id. at 20-21.)

Once they arrived at the Friends Hospital parking lot, TFO Bartle and TFO Efran Torres removed Defendant, who was still handcuffed, from the marked police car and walked him away from the police car so that Mr. Reyes-Valdez could not see them speaking with Defendant.  (Id. at 22.)  TFO Bartle then advised Defendant, in English, of his Miranda rights.  (Id. at 23.)  TFO Torres is a lifelong Spanish speaker, but he did not translate for TFO Bartle.  (Id. at 25, 68-69.) Defendant spoke to TFO Bartle in English and told him that the six kilograms of fentanyl found in the Mercury Mountaineer belonged to Mr. Reyes-Valdez and that he was just the middleman.  (Id. at 25.)

 TFO Bartle subsequently asked Defendant about the property located at 3502 North Philip Street.  (Id.)  Defendant told TFO Bartle that he had a few hundred grams of fentanyl in the 3502 North Philip Street property.  (Id. at 25-26.)  TFO Bartle then told Defendant that he could apply for a search warrant to search 3502 North Philip Street property, or Defendant could consent to a search of the property.  (Id. at 26.)  At approximately 1:15 p.m., TFO Bartle told Defendant that, if he consented to the search, he could be present at the property during the search.  (Id.)  Defendant verbally consented to the search of the 3502 North Philip Street property, after which TFO Bartle

gave Defendant four pieces of paper.  (<u>Id.</u> at 27, 30.)  Those papers were Consent to Search forms

in English and Spanish for the search of the 3502 North Philip Street property and Consent to

Search forms in English and Spanish for the search of an apartment located at 6451 Oxford

Avenue.  (<u>Id.</u> at 31.)

 The English language Consent to Search form for 3502 North Philip Street states the

following:

  1. I HAVE BEEN ASKED TO PERMIT SPECIAL AGENTS OF THE DRUG
   ENFORCEMENT ADMINISTRATION TO SEARCH:   (Describe the
   person, places or things to be searched.)  3502 Phillip [sic] St. Philadelphia
   PA
  2. I HAVE NOT BEEN THREATENED, NOR FORCED IN ANY WAY.
  3. I FREELY CONSENT TO THIS SEARCH.

(Gov't Ex. 1 at 2.)  The Spanish language Consent to Search form for 3502 North Phillip Street

states the following:

  1. SE ME HA PEDIDO QUE AUTORICE A AGENTES ESPECIALES DE
   LA ADMINISTRACION DE CONTROL DE DROGAS A REGISTRAR :
   (Describir la persona, lugar o cosas a registrar.)  3502 Phillip [sic] St.
   Philadelphia PA
  2. NO HE SIDO AMENAZADO/A, NI FORZADO/A DE NINGUNA
   MANERA.
  3. YO HE CONSENTIDO LIBREMENTE A ESTE REGISTRO.

(<u>Id.</u> at 1.)  All of the information quoted above, except for the address of the location to be searched,

was preprinted on the Consent to Search forms.  (<u>Id.</u> at 1-2)  The English and Spanish language

Consent to Search forms for 6451 Oxford Avenue contain identical preprinted language.  (<u>Id.</u> at 3-

4.)  Neither the English language nor the Spanish language versions of the Consent to Search forms

indicate that the Defendant had the right to refuse to give his consent.  (1/25/23 Hr'g Tr. at 56;

Gov't Ex. 1.)

 TFO Bartle, TFO Torres, and Defendant each signed all four Consent to Search forms (one

form in English and one form in Spanish for each of the two properties).  (1/25/23 Hr'g Tr. at 31-

33; Gov't Ex. 1.)  Defendant signed the consent forms as Carlos Vasquez.  (1/25/23 Hr'g Tr. at 32; Gov't Ex. 1.)  TFO Torres discussed the forms with Defendant in Spanish before Defendant signed the forms.  (1/25/23 Hr'g Tr. at 34.)  TFO Torres had Defendant read the Spanish language Consent to Search forms out loud when they were presented to him for his signature.  (Id. at 61.)  TFO Torres also asked Defendant, in Spanish, if he understood the forms.  (Id.)  Defendant has admitted that, before he signed the Consent to Search forms, he was told that one of the forms would allow the Task Force Officers to go to the 3502 North Philip Street property.  (Id. at 112.)

After Defendant signed the Consent to Search forms, he made it clear to TFO Bartle that he possessed the 3502 Phillip Street property and that there were a woman, a child, and another person at the house at that time.  (Id. at 35-36.)  Defendant then told TFO Bartle which of his keys would open the door for the 3502 North Philip Street property and which key would open the door for the 6451 Oxford Avenue property.  (Id. at 36.)  Defendant also told TFO Bartle where to find the fentanyl in the 3502 North Philip Street property.  (Id.)  Specifically, Defendant told Officer Bartle that there were two boxes in a shelving unit in the basement of the property on a yellow shelf at approximately chest height, which contained packaging for the fentanyl and a couple hundred grams of fentanyl.  (Id.; Gov't Exs. 3A, 3B.)

After their conversation with Defendant, Task Force Officers Bartle and Torres, along with additional Task Force Officers, went to 3502 North Philip Street.  (1/25/23 Hr'g Tr. at 39, 43.)  Defendant was taken to 3502 North Philip Street in the marked police car.  (Id. at 39-40.)  Immediately after he arrived at 3502 North Philip Street, TFO Bartle checked the yellow storage shelf in the basement, where Defendant told him he would find fentanyl.  (Id. at 42-43; Gov't Exs. 3A, 3B.)  TFO Bartle found approximately 700 grams of fentanyl, packing material, and a small

amount of fentanyl in small blue glassine packets in two boxes that were on the yellow shelf. (1/25/23 Hr'g Tr. at 43-45.)

Defendant's testimony regarding his conversations with the Task Force Officers and his execution of the Consent to Search forms was not credible. Defendant testified that he did not see TFO Torres on the day that he was arrested. (Id. at 79.) He further testified that an officer who resembled TFO Bartle was present on the day he was arrested and spoke to him in both English and Spanish. (Id.) However, Defendant also testified that he does not remember TFO Bartle speaking to him on October 28, 2020. (Id. at 81.) Defendant further testified that another officer who wore a name badge that identified him as C. Williams was present when he was being questioned and spoke to him in English and Spanish for about eight minutes. (Id. at 80-81.) TFO Torres denied that any other Task Force Officers spoke with Defendant in the Friends Hospital parking lot that day, that there was a law enforcement officer named Williams present that day, and that there was anyone named Williams on the Task Force. (Id. at 118-19.)

Defendant's testimony regarding his connection to the 3502 North Philip Street property was also not credible. Defendant testified that, while he had been in the property located at 3502 Philip Street, it was not his house, he had never been in the basement of that house, and he did not tell the Task Force Officers that there was fentanyl and packing material in the basement of that house. (Id. at 87-88.) Defendant also testified that he had the key to 3502 North Philip Street because someone he was with on the Sunday and Monday prior to his arrest put the key on his keychain, but he had never used the key. (Id. at 99-100.) Specifically, Defendant testified that the Sunday before his arrest he had been drinking with a friend and the friend had the key to 3502 North Philip Street and put the key on his keychain. (Id. at 100.)

7

Defendant's testimony regarding the fentanyl in the Mercury Mountaineer was also not credible.  Defendant testified that he drove his girlfriend's car on the day of his arrest, he did not put the fentanyl in the car, and he could not tell the Court who put the drugs in the car.  (Id. at 91, 106.)  Defendant further testified that he is "not authorized to tell you or to legally speak of the person who put [the fentanyl] there."  (Id. at 91.)  We conclude, based on Defendant's testimony that he was questioned by a law enforcement officer named C. Williams rather than Task Force Officers Bartle and Torres, his testimony regarding his acquisition of the key to 3502 North Philip Street, and his denial that he could legally identify the person who placed the fentanyl in his girlfriend's car, that Defendant did not appear to be credible during his Hearing testimony.

## II.      LEGAL STANDARD

Defendant argues that we should suppress all of the physical evidence seized from 3502 North Philip Street[4] because the Task Force Officers who seized that evidence violated his Fourth Amendment rights by conducting warrantless searches without his actual and voluntary consent. The Fourth Amendment states that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV.  "'Generally, for a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause.'"  United States v. Brown, 448 F.3d 239, 244 (3d Cir. 2006) (quoting United States v. Robertson, 305 F.3d 164, 167 (3d Cir. 2002)). However, "[i]t is . . . well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."  Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) (citations omitted).

---

[4] The Government states in its response to the Motion to Suppress that no evidence was recovered from 6451 Oxford Street.  (Gov't Resp. at 1.)

The Government argues that we should deny the Motion because Defendant voluntarily consented to the searches of 3502 North Philip Street and 6451 Oxford Avenue, Apartment D117. "When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given.  This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority." Bumper v. North Carolina, 391 U.S. 543, 548-49 (1968) (citations omitted).  "'[W]e determine the voluntariness of a consent by examining the totality of the circumstances.'" United States v. Stabile, 633 F.3d 219, 231 (3d Cir. 2011) (alteration in original) (quoting United States v. Price, 558 F.3d 270, 278 (3d Cir. 2009) (citing Schneckloth, 412 U.S. at 226).  "We consider such factors as 'age, education, and intelligence of the subject; whether the subject was advised of his or her constitutional rights; the length of the encounter, the repetition or duration of the questioning; and the use of physical punishment.'" Id. (quoting Price, 558 F.3d at 278) (citing Schneckloth, 412 U.S. at 226).  "The 'setting in which the consent was obtained [and] the parties' verbal and non-verbal actions' are also relevant." Id. (alteration in original) (quoting Price, 558 F.3d at 278).  We consider these factors in turn.

III.  **DISCUSSION**

A.   Age, Education, and Intelligence of the Defendant

As we discussed above, Defendant is 38 years old and attended public school in Puerto Rico, where he was taught in Spanish, through the fifth grade.  (1/25/23 Hr'g Tr. at 74-75.)  In addition, Defendant took English as a second language classes for one hour each day for two years when he was in prison.  (Id. at 76-77.)  Defendant asserts that he would not feel comfortable having a conversation in English.  (See id. at 77.)  There is no evidence before us regarding Defendant's

intelligence.  We therefore conclude that Defendant's lack of formal education in English weighs

against a conclusion that his consent to the search of his properties was voluntary.

       B.     <u>Whether the Defendant Was Advised of His Constitutional Rights</u>

Defendant was advised of his <u>Miranda</u> rights by TFO Bartle shortly after Defendant arrived

in the Friends Hospital parking lot.  (<u>Id.</u> at 22-23.)  TFO Bartle advised Defendant of his <u>Miranda</u>

rights, in English, before he and TFO Torres discussed the Consent to Search forms with

Defendant.  (<u>Id.</u> at 65-66.)  TFO Torres was present when TFO Bartle advised Defendant of his

<u>Miranda</u> rights.  (<u>Id.</u> at 65.)  TFO Torres believes that Defendant understood and appreciated his

rights, even though they were read to him in English, because Defendant acted in a way that was

"very cooperative" and "[h]e wanted to talk."  (<u>Id.</u> at 66-67.)  The fact that a defendant is "aware

of his <u>Miranda</u> rights prior to giving consent tends to show his consent was voluntary."  <u>United

States v. Jones</u>, Crim. A. No. 09-269, 2009 WL 4268451, at *2 (E.D. Pa. Nov. 24, 2009) (citing

<u>Virgin Islands v. Berne</u>, 412 F.2d 1055, 1062 (3d Cir. 1969); <u>Sewell v. Dever</u>, 581 F. Supp. 556,

560 (W.D. Pa. 1984); <u>United States v. Lowery</u>, Crim. A. No. 04-757, 2005 WL 3078222, at *3

(E.D. Pa. Nov. 15, 2005)); <u>see also</u> <u>United States v. Hovan</u>, Crim. A. No. 20-254-1, 2021 WL

3771811, at *5 (E.D. Pa. Aug. 24, 2021) (concluding that the second factor weighed in favor of

voluntariness because the defendant "was advised of his <u>Miranda</u> rights at the outset of [his

interview with the FBI]").

Nevertheless, Defendant argues that this factor weighs against a finding of voluntariness

because he was not advised that he could refuse to consent.  However, "the Government need not

inform the subject of his right to refuse consent."  <u>Stabile</u>, 633 F.3d at 231 (citing <u>Schneckloth</u>,

412 U.S. at 227; <u>United States v. Kim</u>, 27 F.3d 947, 955 (3d Cir. 1994)); <u>see also</u> <u>Price</u>, 558 F.3d

at  279 (stating that "the Government is not 'required to advise the defendant of his right to refuse

consent before eliciting his consent'" (quoting Kim, 27 F.3d at 955)); United States v. Vaghari, 653 F. Supp. 2d 537, 544 (E.D. Pa. 2009), aff'd, 500 F. App'x 139 (3d Cir. 2012) ("Both the Supreme Court and the Third Circuit have held that for a search or seizure to be consensual, an individual need not be advised of his right to refuse consent." (citing Schneckloth, 412 U.S. at 227; Kim, 27 F.3d at 955)).  "'While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the *sine qua non* of an effective consent.'" Vaghari, 653 F. Supp. 2d at 544 (quoting Schneckloth, 412 U.S. at 227).  "The Schneckloth Court explicitly rejected requiring Miranda-like warnings before a consent search." Id. (citing Schneckloth, 412 U.S. at 231).  "Rather than being dispositive, the failure to advise an individual of his right to refuse consent is instead only one factor to consider in the totality-of-the-circumstances analysis." Id. (citing Kim, 27 F.3d at 955).  Since Defendant was advised of his Miranda rights before he was asked to consent to the search of his properties, we conclude that this factor favors the conclusion that Defendant voluntarily consented to the searches of his properties, even though he was not specifically advised that he had the right to refuse to consent.

C.     The Length of the Encounter and the Repetition or Duration of the Questioning

TFO Bartle testified that Defendant gave his verbal consent to the searches of his properties and signed the consent forms in the Friends Hospital parking lot at approximately 1:15 p.m. on October 28, 2020.  (1/25/23 Hr'g Tr. at 26, 54-55.)  TFO Bartle arrested Defendant at 1:03 p.m. that day.  (Id. at 18.)  TFO Torres testified that he and TFO Bartle spent approximately 10 to 15 minutes speaking with Defendant in the Friend's Hospital parking lot. (Id. at 62-63.)  Accordingly, we find that Defendant did not spend more than fifteen minutes with TFO Bartle and TFO Torres before he signed the Consent to Search forms.  Defendant does not contend that his encounter with the TFOs involved repeated questioning.  We thus conclude that, because the encounter leading to

11

Defendants' verbal and written consent to the searches of his properties was brief and did not involve repeated questioning, this factor weighs in favor of a conclusion that his consent to the searches was voluntary.  See United States v. Martinez, 771 F. Supp. 2d 378, 381 (E.D. Pa. 2011), aff'd, 460 4. App'x 190 (3d Cir. 2012) (concluding that the length of the encounter and repetition and duration of questioning factor favored voluntariness where "the encounter leading to [the defendant's] consent was brief and did not involve repeated questioning"); Vaghari, 653 F. Supp. 2d at 545 (reasoning that the officers' presence in the defendant's apartment for only about 30 minutes weighed in favor of a finding that the defendant's consent to the seizure of items from his apartment was voluntary); Hovan, 2021 WL 3771811, at *6 (finding that the third factor weighed in favor of voluntariness where the FBI agents asked for consent to search the defendant's "phones twenty-nine minutes into the interview, and [the defendant] signed the consent form approximately thirty-two minutes into the interview").

> D.     The Use of Physical Punishment

TFO Bartle denies touching Defendant in any way during their conversation.  (1/25/23 Hr'g Tr. at 39.)  Defendant does not contend that the Task Force Officers used physical punishment to obtain his consent to search his properties.  We conclude, accordingly, that this factor favors a finding that he voluntarily gave his consent.  See Hovan, 2021 WL 3771811, at *6 (finding that "[t]he fourth factor – 'the use of physical punishment' – weighs in favor of voluntariness" where the defendant did not "allege–and the record does not suggest–that the special agents used force or physical intimidation").

> E.     The Setting in Which Consent Was Obtained

Defendant argues that the setting of TFO Bartle's request that he consent to the searches weighs against a finding of voluntariness.  "Consent is not voluntary . . . when provided under

duress or as a result of coercion." <u>United States v. Latorre-Cacho</u>, Crim. A. No. 21-160, 2022 WL 16541170, at *7 (M.D. Pa. Oct. 28, 2022) (citing <u>Schneckloth</u>, 412 U.S. at 227).  Defendant asserts that four different aspects of the setting in which he consented to the searches of his properties weigh against a finding of voluntariness:  (1) the scene of his arrest was chaotic and, in the immediate aftermath of his arrest, he appeared to be in shock; (2) he was in custody when he signed the Consent to Search forms; (3) the Task Force Officers made false statements to induce him to consent; and (4) he was asked to give his consent in English, a language in which he is not conversant.

1.   <u>The chaotic scene</u>

At the time of Defendant's arrest, at approximately 1:03 p.m., the Task Force had at least five unmarked vehicles and one fully marked Philadelphia police car with lights and sirens in the Walmart/Home Depot parking lot.  (1/25/23 Hr'g Tr. at 17-18.)  The Task Force Officers were in plain clothes but were wearing tactical gear, i.e., vests with police markings.  (<u>Id.</u> at 18-19.)  Some of the Task Force Officers who approached the Defendant's car had their weapons out.  (<u>Id.</u> at 19.)  TFO Bartle holstered his weapon before he took Defendant out of his car.  (<u>Id.</u>)  Defendant was handcuffed when he was taken out of his car and placed in a marked police car with two uniformed police officers.  (<u>Id.</u>)  In addition, a crowd of onlookers formed around the scene because the Walmart/Home Depot parking lot was busy.  (<u>Id.</u> at 20.)  When Defendant was first arrested, he appeared to be "in some sort of shock."  (<u>Id.</u> at 21.)  Defendant seemed nervous and surprised to see the TFOs.  (<u>Id.</u>)  Defendant testified that he was very nervous when he was arrested because the Task Force Officers were shouting and they had guns.  (<u>Id.</u> at 89.)

Once Defendant was taken to the Friends Hospital parking lot, TFO Bartle removed him from the marked police car and he and TFO Torres walked Defendant several car lengths from the

marked police car so that they could talk to Defendant without being observed by Mr. Reyes-Valdez.  (Id. at 22.)  TFO Bartle did not have a weapon out and he was not wearing his tactical vest during the time he spoke with Defendant in the Friends Hospital parking lot.  (Id. at 38-39.)  TFO Bartle testified that Defendant started talking as soon as he was removed from the marked police car, saying things like "'[h]ey listen, that stuff's not mine'" and "[l]isten, you know, that stuff, I'm just a middleman.'"  (Id. at 22-23.)  Defendant kept talking while TFO Bartle gave him his Miranda rights.  (Id. at 23.)  TFO Torres testified that Defendant was excited when he first started talking to Officer Bartle at the Friends Hospital parking lot and tried "to put some blame on a codefendant, another individual that was part of the investigation."  (Id. at 64.)  TFO Torres further testified that TFO Bartle was eventually able to calm Defendant and they were able to have a conversation.  (Id. at 65.)  We conclude that the Hearing testimony supports Defendant's position that the scene of his arrest was chaotic and that he appeared to be in shock at his arrest.

Nonetheless, the fact that some of the Task Force Officers had their guns drawn when they arrested Defendant does not necessarily weigh against a finding of voluntariness.  "The critical inquiry is whether after that initial necessary display of force to protect the safety of the law enforcement agents, the guns remained drawn and trained on the person during questioning."  United States v. Burley, Crim. A. No. 19-8, 2020 WL 4227524, at *4 (W.D. Pa. July 23, 2020).  Defendant does not claim that TFO Bartle or TFO Torres had their guns drawn when he was questioned or when he was asked to sign the Consent to Search forms.  Officer Bartle testified that he did not have his gun out when he questioned Defendant and asked him to sign the Consent to Search forms.  (1/25/23 Hr'g Tr. at 38-39.)  "That kind of de-escalation removes any kind of coercive taint from the situation."  Burley, 2020 WL 4227524, at *4 (citing United States v. Mendoza, 334 F. App'x 515, 518 (3d Cir. 2009); United States v. Kozinski, 16 F.3d 795, 810 (7th

Cir. 1994); United States v. Scott, 732 F.3d 910, 917 (8th Cir. 2013)); see also Mendoza, 334 F. App'x at 518 (affirming district court's finding that the defendant had voluntarily consented to the search of his car even though the officer had drawn his weapon when he approached the car and placed him in handcuffs because the officer's "weapon was drawn only for ten seconds and had been holstered for several minutes by the time [the defendant] gave his consent to the search of his vehicle").

Defendant has cited to no authority for the proposition that a defendant's shock at being arrested, or being in a chaotic scene before he is asked to give consent to a search, weighs against a finding that the consent is voluntary. Moreover, there is evidence that Defendant had calmed and was no longer in shock at the time he was asked to consent to the searches of his properties while he was in the Friends Hospital parking lot. (See 1/25/23 Hr'g Tr. at 65.) In addition, Task Force Officers Bartle and Torres walked Defendant away from other people and law enforcement officers before talking to him in the Friends Hospital parking lot. In fact, the only people present when the Task Force Officers talked with Defendant in the Friends Hospital parking lot were TFO Bartle, TFO Torres, their supervisor (who came over once in a while), and the Defendant. (Id. at 62-63.) Under all of these circumstances, we conclude that the chaotic scene surrounding Defendant's arrest in the Walmart/Home Depot parking lot does not weigh against a finding that his consent to the searches of his properties was voluntary.

## 2. Custody

Defendant was in police custody and in handcuffs at the time he was asked to sign the Consent to Search forms. In addition, Defendant has testified that one of his wrists was still handcuffed at the time he signed those forms. (Id. at 83.) However, "[a]s an initial matter, 'the fact of custody alone has never been enough in itself to demonstrate a coerced . . . consent to

search.'"  Hovan, 2021 WL 3771811, at *6 (second alteration in original) (quoting United States

v. Watson, 423 U.S. 411, 424 (1976)).  "Furthermore, there is 'no indication in this record that

[Defendant] was . . . unable in the face of a custodial arrest to exercise a free choice.'"  Id. (second

alteration in original) (quoting Watson, 423 U.S. at 424-25); see also United States v. Kellam, 751

F. App'x 184, 189 (3d Cir. 2018) (concluding that the district court correctly found that the

defendant voluntarily consented to the search of his residence after considering the totality of the

circumstances even though the defendant "was in custody and surrounded by law enforcement

authorities" when he was asked to consent); United States v. Ortiz, 483 F. App'x 712, 716 (3d Cir.

2012) (affirming district court holding that defendant voluntarily consented to the search of his

home and garage even though he was handcuffed at the time he gave his consent).  We conclude

that the fact that Defendant was in custody at the time he signed the Consent to Search forms and

gave his consent for the searches of the properties does not weigh against a finding of

voluntariness.

3.      False statements by law enforcement officers

Defendant testified that, when he was asked to sign the Consent to Search forms, he was

unable to read what they said, in English or Spanish, because the officer who gave him the forms

covered the top portions of the forms with his hand while Defendant signed them.  (1/25/23 Hr'g

Tr. at 84.)  Defendant testified that he signed the forms anyway because he was told, by the officer

who presented him with the forms, that the officer would search the properties whether he signed

the form or not and that the forms were not "anything important."  (Id. at 84.)  "If a law enforcement

agent makes false statements or misrepresentations to induce consent, even if those falsehoods are

innocently made, then an even heavier burden is placed on the government to prove voluntary

consent."  United States v. Adams, Crim. A. No. 21-144-1, 2022 WL 16531963, at *5 (E.D. Pa.

Oct. 28, 2022) (citing <u>United States v. Molt</u>, 589 F.2d 1247, 1251-52 (3d Cir. 1978); <u>United States v. Sebetich</u>, 776 F.2d 412, 424 (3d Cir. 1985)).

TFO Bartle testified that he told Defendant that he could "go apply for a search warrant" and that he had sufficient probable cause to obtain a warrant to search the properties. (See 1/25/23 Hr'g Tr. at 26.) A threat to obtain a warrant if the defendant does not consent to a search does not undermine voluntariness if that threat is not "'baseless.'" See <u>Adams</u>, 2022 WL 16531963, at *7 (concluding that a threat to obtain a warrant if the defendant did not consent to a search of his phone did not undermine voluntariness where the threat was not "'baseless'" but, instead, was a fair explanation of how the agent "would proceed if [the defendant] refused consent" (citations omitted)). Accordingly, we conclude that TFO Bartle's statement that he could obtain a warrant to search the properties if Defendant did not consent to the searches does not undermine voluntariness in this case.[5]

In addition, Defendant's testimony regarding the circumstances in which these allegedly false statements were made is not credible. Initially, his testimony contradicts the testimony of TFO Bartle with respect to the language that TFO Bartle used to speak with Defendant. TFO

---

[5] "A Magistrate Judge properly concludes that probable cause exists when 'given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" <u>United States v. Golden</u>, No. 21-2618, 2023 WL 2446899, at *2 (3d Cir. Mar. 10, 2023) (quoting <u>Illinois v. Gates</u>, 462 U.S. 213, 238 (1983)). "Direct evidence linking the alleged offense to the place to be searched is not required." <u>Id.</u> (citing <u>United States v. Whitner</u>, 219 F.3d 289, 297 (3d Cir. 2000)) (remaining citations omitted). "The Magistrate Judge may identify a sufficient nexus between an alleged offense and the place to be searched by drawing 'reasonable inferences.'" <u>Id.</u> (quoting <u>United States v. Hodge</u>, 246 F.3d 301, 305-06 (3d Cir. 2001)). When Defendant was arrested in the Mercury Mountaineer, the Task Force Officers found six kilograms of fentanyl in a Pampers diaper box on the passenger seat of that vehicle. (1/25/23 Hr'g Tr. at 18.) Defendant's girlfriend lives in the 6451 Oxford Avenue apartment. (<u>Id.</u> at 106.) In addition, the Task Force had identified 3502 North Philip Street as a place where Defendant spent the night. (<u>Id.</u> at 8-9.) We conclude that TFO Bartle's threat to obtain a warrant to search the properties was not baseless.

Bartle testified that he spoke to Defendant entirely in English and that he (TFO Bartle) does not speak any Spanish.  (See 1/25/23 Hr'g Tr. at 24.)  Defendant, however, testified that TFO Bartle spoke to him in both Spanish and English.  (Id. at 79.)  Defendant's testimony with respect to the identity of the officer with whom he spoke in the Friends Hospital parking lot also contradicts the testimony of TFO Bartle and TFO Torres.  TFO Bartle and TFO Torres both testified that they spoke with Defendant in the Friends Hospital parking lot.  (See id. at 22-29; 66-69.)  Defendant, however, testified that an officer named Williams spoke with him there in English and Spanish. (Id. at 80, 95.)  Defendant further testified that he did not remember speaking with TFO Bartle on the day of his arrest and that he only spoke with Williams.  (Id. at 81, 99.)  TFO Torres testified that there were no Task Force Officers named Williams in the Friends Hospital parking lot on the day of Defendant's arrest and that there were no officers named Williams in the Task Force.  (Id. at 118.)  Furthermore, Defendant did not identify the officer who allegedly told him that the Consent to Search forms were not important.  (Id. at 83-84.)  However, since Defendant testified that the only officer he spoke with in the Friends Hospital parking lot was named Williams, we must infer that Defendant meant that Williams is the officer who misled Defendant about the importance of the forms.  Since there is evidence that there were no officers named Williams present when Defendant signed the Consent to Search forms, we conclude that Defendant's testimony regarding this exchange is not credible and does not weigh against a finding that he voluntarily consented to the search of his properties.  (Id. at 95, 99.)

####           4.     The parties' verbal actions

Defendant also argues that he could not have voluntarily given his consent to the searches of his properties because he does not speak English.  Both TFO Bartle and TFO Torres testified that Defendant spoke to them in English and appeared to understand what they were saying to him.

TFO Bartle testified that, when he and TFO Torres walked with Defendant away from the marked police car in the Friends Hospital parking lot, Defendant said:  "'Hey, listen, that stuff's not mine.  That's – that's his.  That's his.  And he's got more.  I can help you out.'"  (Id. at 22-23.)  Once they had walked to a place where they could not be seen by Mr. Reyes-Valdez, Defendant said "'Listen, you know, that stuff, I'm just a middleman.'"  (Id. at 23.)  TFO Bartle also testified that, when he was giving Defendant his Miranda rights, Defendant cut him off and said "'[n]o, no, no.  I want to talk to say mine.'"  (Id.)  TFO Bartle further testified that he spoke only English to Defendant, that Defendant responded to the things he told him, and that Officer Torres, who speaks Spanish, did not have to translate for him.  (Id. at 24-25.)  TFO Bartle additionally testified that, when he asked Defendant about the 3502 North Philip Street property, Defendant told him that there were only a couple hundred grams of fentanyl at that property.  (Id. at 25.)  TFO Bartle testified that he explained the Consent to Search forms in English and he and Defendant subsequently signed the English language Consent to Search forms.  (Id. at 34.)  TFO Bartle also testified that TFO Torres then spoke to Defendant in Spanish and Defendant responded to TFO Torres in Spanish before Defendant and TFO Torres signed the Spanish language Consent to Search forms.  (Id.)  TFO Bartle then testified that, after he signed the Consent to Search forms, Defendant told TFO Bartle which of his keys would unlock the door at the 3502 North Philip Street property and which key would unlock the Oxford Avenue apartment.  (Id. at 36.)  TFO Bartle also testified that Defendant told him where to find the fentanyl in the 3502 North Philip Street property:

> [T]he Defendant specifically told me in English where I can find this couple hundred grams of fentanyl. He told me specifically when I walked down into the basement and on a shelving unit about chest high is where he keeps two boxes filled with the stuff he uses to package the fentanyl and the little bit of fentanyl that he said he had.  And he told me it was on a yellow shelf in the basement specifically.

(Id.)  Officer Bartle testified that he found 700 grams of fentanyl in two boxes on the yellow shelf that Defendant told him to check.  (Id. at 43-45.)

Officer Torres testified that he was present when TFO Bartle spoke with Defendant in the Friends Hospital parking lot and he observed them speaking in English.  (Id. at 62-63.)  TFO Torres did not have to translate for TFO Bartle or Defendant and he believed that Defendant was conversant in English.  (Id. at 63.)  TFO Torres was present when TFO Bartle gave Defendant his Miranda rights and believed that Defendant understood and appreciated his rights.  (Id. at 66.) TFO Torres also testified that he did not read the Spanish language version of the Consent to Search form to Defendant.  (Id. at 69.)  Rather, he had Defendant read the document out loud to him.  (Id.)

Based on this credible testimony from TFO Bartle and TFO Torres, we conclude that Defendant's claim that he does not speak English and therefore could not have given his consent to search his properties does not weigh against a finding of voluntariness in this case because both TFO Bartle and TFO Torres spoke to Defendant in English and reasonably believed that he understood them.  See United States v. Villanueva-Bautista, Crim. A. No. 20-114, 2022 WL 407370, at *5 (E.D. Pa. Feb. 10, 2022) (concluding that police officers were believable because they stated that the Spanish-speaking defendant understood what they told him in English where they testified that the defendant responded appropriately to their requests and "[n]othing about his responses to the officers' inquiries suggest[ed] [that] he did not understand them").  See also United States v. Tejada, Crim. A. No. 99-676, 1999 WL 1241090, at *3-5 (E.D. Pa. Dec. 10, 1999) (concluding that police officers reasonably believed that the defendant had voluntarily consented to the search of his apartment after he was verbally asked to give such consent in English, even though Defendant testified that he did not speak English at the time the search took place, because

the defendant's "consent was twice given intelligently, in the absence of duress or coercion, express or implied, and was unequivocal," this consent "was followed by written confirmation," and the "[d]efendant's conduct also confirm[ed] the validity and voluntariness of the search").

Based on Defendant's lack of credibility regarding his conversations with TFO Bartle and TFO Torres at the Friends Hospital parking lot and the credible testimony of TFO Bartle and TFO Torres regarding the circumstances in which Defendant consented to the searches of his properties and signed the Consent to Search forms, we reject Defendant's argument that his lack of ability to speak English weighs against a finding that he voluntarily consented to the searches of the properties.

## V.      CONCLUSION

We have found that one of the voluntariness factors, the Defendant's age, education, and intelligence, weighs against a finding that Defendant voluntarily consented to the searches of his properties. See Stabile, 633 F.3d at 231 (citations omitted). We have also found that the remaining four factors, i.e., whether Defendant was advised of his constitutional rights, the length of his encounter with law enforcement officers, the use of physical punishment, and the setting in which his consent was obtained, including the parties' verbal actions, weigh in favor of a finding that he voluntarily consented to the searches of his properties. See id. (citations omitted). Accordingly, we conclude that Defendant voluntarily consented to the searches of 3502 North Philip Street and 6451 Oxford Avenue and that the searches of those properties did not violate the Fourth Amendment. We therefore deny the instant Motion to Suppress.

BY THE COURT:


/s/ John R. Padova
_____
John R. Padova, J.

21